UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN MICHELE BLAIR,            :
                                :CIVIL ACTION NO. 3:15-CV-1974
        Plaintiff,              :
                                :(JUDGE CONABOY)
        v.                      :
                                :
CAROLYN W. COLVIN,              :
Acting Commissioner of          :
Social Security,                :
                                :
        Defendant.              :
                                :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.)  She alleged disability beginning on September 22, 2011. (R. 18.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Randy Riley, concluded in his August 28, 2014, decision that Plaintiff's severe impairments of degenerative disc disease of the lumbar spine and the cervical spine, fibromyalgia, headaches, and mood disorder did not alone or in combination meet or equal the listings. (R. 21-24.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy. (R. 24-30.)  ALJ Riley therefore found Plaintiff was not disabled under the Act from September 22, 2011, through the date of the decision.

(R. 26.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be reversed and the matter should be remanded for the following reasons: 1) the ALJ failed to properly evaluate the medical evidence; and 2) the ALJ failed to properly evaluate Plaintiff's subjective complaints. (Doc. 7 at 14.)  After careful review of the record and the parties' filings, I conclude this matter is properly remanded to the Acting Commissioner for further consideration.

## I. Background

### A.    *Procedural Background*

Plaintiff protectively filed for DIB on December 22, 2012. (R. 19.)  The claim was  initially denied on April 18, 2013, and Plaintiff filed a request for a hearing before an ALJ on May 17, 2013.  (*Id.*)

ALJ Riley held a hearing on August 21, 2014.  (R. 18.) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Paul A. Anderson.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on August 28, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 26.)

On September 11, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September

2

9, 2015. (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On October 9, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 18, 2015.  (Docs. 5, 6.)  Plaintiff filed her supporting brief on February 1, 2016.  (Doc. 7.)  Defendant filed her brief on March 4, 2016.  (Doc. 8.)  Plaintiff filed her reply brief on March 16, 2016.  (Doc. 9.)  Therefore, this matter is fully briefed and ripe for disposition.

### B.   *Factual Background*

Plaintiff was born on July 30, 1961--she was fifty years old on the alleged disability onset date.  (R. 30.)  Plaintiff has a high school education and has past relevant work as a personal attendant and child day care center provider.  (*Id.*)

### 1.   **Impairment Evidence**

The following summary focuses on Plaintiff's physical impairments.  While some evidence of alleged mental health difficulties is included to provide a balanced background, detailed mental health evidence is not necessary because Plaintiff does not challenge the ALJ's findings regarding her alleged mental impairments.  (*See* Doc. 7 at 16 n.5.)

Plaintiff had a work physical on January 26, 2010.  (R. 208.)  Though before the relevant time period, the report summarizes

3

Plaintiff's chronic problems and health status.  (*Id.*)  Type II
diabetes, fibromyalgia, high triglycerides, hyperlipidemia,
migraines, and 2004 gastric bypass were noted to be chronic medical
problems for which she follows up with Douglas Martzluf, M.D.
(*Id.*)  At the time she was taking Zyrtec, Prilosec, Fioricet,
Tricor, Hydrochlorothiazide, Effexor, and Zocor.  (*Id.*)  Plaintiff
had no complaints besides her chronic medical problems.  (*Id.*)

In December 2010, Plaintiff saw Ali El-Mohandes, M.D., her
pain management specialist at The Spine Center.  (R. 175.)  He
noted that Plaintiff presented with multiple areas of pain since
mid 2007, she plateaued with physical therapy and medical
management, and the pain was moderate to severe.  (*Id.*)  System
review revealed the following findings: joint stiffness, decreased
range of motion, extremity pain, and difficulty walking.  (*Id.*)
Dr. El-Mohandes recorded that Plaintiff's activities of daily
living were limited, including exercise, recreation, shopping, and
household chores but she managed some work and socializing.  (*Id.*)
In his "Summary & Treatment Plan," Dr. El-Mohandes reported that
Plaintiff "was doing quite well until the FDA decided to revoke
propoxyphene." (*Id.*)  It was decided to continue medical
management with some medication changes.  (*Id.*)

She also saw her primary care doctor, Douglass Martzluf, M.D.,
in December 2010.  (R. 222.)  Related to her medication for
fibromyalgia managed through the pain clinic, Dr. Martzluf noted

4

that Plaintiff was off Darvocet because it was taken off the market and she had tried Lyrica but went off that because of swelling. (*Id.*)  The main reason for Plaintiff's visit was related to depression, and Dr. Martzluf's Assessment was major depression and fibromyalgia.  (*Id.*)

On January 14, 2011, Plaintiff reported improvement in her low back and hip pain following bilateral lumbar facet denervation. (R. 172.)  Dr. El-Mohandes listed the following diagnoses: lumbar radiculopathy, "diffuse myalgia/? fibromyalgia," supraspinatus tendinopathy, multiple arthralgia, hypertension, diabetes, and depression.  (*Id.*)

On February 3, 2011, Plaintiff presented to Dr. Martzluf's office requesting pain medication.  (R. 219.)  Certified Registered Nurse Practitioner ("CRNP") Jeanna J. Moats noted that Plaintiff "goes to the pain clinic and states that they would not give her any more.  Argued with them on the phone regarding appointment time and over use of medication."  (*Id.*)  Plaintiff admitted to sometimes taking her opioid medication (Nucynta) more frequently than prescribed and CRNP Moats told Plaintiff to talk with her pain management specialist about her pain being out of control.  (*Id.*) CRNP Moats also noted that Plaintiff had been evaluated by psychiatry and, according to Plaintiff's recollection, they didn't feel that she was depressed other than suffering from severe pain. (*Id.*)  CRNP Moats added Tramadol to Plaintiff's medication regimen

5

and stressed the need for her to discuss problems with the pain clinic and not overuse her opioid medication.  (*Id.*)

On February 11, 2011, Plaintiff presented to Dr. El-Mohandes with increased pain levels and reported diminished response to one of her medications.  (R. 171.)  Dr. El-Mohandes adjusted Plaintiff's medication regimen.  (*Id.*)

From  through July 2011, Plaintiff saw Dr. El-Mohandes at least monthly.  (R. 166, 170, 173, 174, 176, 177.)  In March she reported neck pain with headaches and numbness to her fingers especially in the morning, low back pain, and muscle pain.  (R. 177.)  Dr. El-Mohandes noted that examination was consistent with neuropathic pain more than radiculopathy, as well as a superimposed myofascial pain component and multisite arthralgia.  (*Id.*)  His diagnoses were cervicogenic pain and headaches, cervical radiculopathy versus thoracic outlet syndrome, lumbar radiculopathy, multiple arthralgia and myalgia, hypertension, diabetes, and depression.  (*Id.*)  Plaintiff received a cervical translaminar steroid injection on April 1, 2011, which was administered because she had failed conservative treatment.  (R. 173.)  She reported improvement after the injection and received another injection on April 15, 2011.  (R. 174.)  In May Plaintiff reported that, due to improvement, she had discontinued some medications with no adverse reactions or problems and she wanted to consider less potent medications for pain control.  (R. 176.)  Dr.

6

El-Mohandes noted that "[e]xamination remains consistent with cervicogenic legs and facet arthropathy/radiculopathy. (*Id.*)  In June Plaintiff reported increased pain over the preceding several weeks, noting that Tramadol was not helpful. (R. 166.)  Dr. El-Mohandes changed her medication. (*Id.*)  In July, Plaintiff reported that the change in medication helped and noted that she used Dilaudid two to three time a week for breakthrough pain. (R. 170.)

On September 8, 2011, Plaintiff presented to Dr. El-Mohandes with increasing global pain throughout her major joints and the shoulder/pelvic girdle. (R. 165.)  Dr. El-Mohandes found that examination was more indicative of a widespread myofascial pain component and arthralgia. (*Id.*)  It was decided to continue the same medication management and use a Medrol dosepak or nasal Toredol spray as a global anti-inflammatory for several days. (*Id.*)  Dr. El-Mohandes noted that he "explained flareups and the self-limiting nature of this condition" and discussed realistic expectations for pain control. (*Id.*)  He noted that Plaintiff understood she would likely always be in some degree of pain. (*Id.*)

On September 12, 2011, Plaintiff again saw Dr. Martzluf to discuss recent emotional changes and to see if any medication changes were necessary. (R. 234.)  He reported that Plaintiff had accidentally gone off Effexor but had gone back on it and was

feeling somewhat out of control.  (*Id.*)  Plaintiff said her mother
had moved out of the house into Manor Care because of the
amputation, Plaintiff had gone to Ocean City for three weeks when
her grandchild was born, and Plaintiff was quitting her child care
job which she had for ten years.  (*Id.*)   He noted that Plaintiff
continued to work with the pain clinic and had recently been
started on Dilaudid and Opana.  (R. 234.)

In October 2011, Plaintiff presented with "fairly stable pain
levels."  (R. 164.)   Dr. El-Mohandes again noted that Plaintiff
understood "the nature of her fibromyalgia, and that flareups and
the self-limiting nature of this condition."  (*Id.*)  At her
Novmeber appointment, Dr. El-Mohandes reported that Plaintiff was
very tearful due to family stressors but otherwise her presentation
and treatment plan was similar to the preceding months.  (R. 167.)

On December 2, 2011, Plaintiff reported increased neck and arm
pain complaints with tingling to the fingers of the right hand.
(R. 168.)  Dr. El-Mohandes noted that examination was consistent
with radiculopathy but there was no weakness.  (*Id.*)  He added a
medication and said he would consider electrodiagnostic evaluation
and repeat epidural steroid placement.  (*Id.*)  Later in the month
Plaintiff reported some improvement with the new medication.  (R.
169.)  Dr. El-Mohandes noted that he was awaiting the results of
NVC testing, he would consider obtaining an MRI if her symptoms did
not improve, and he could consider a cervical steroid injection.

(*Id.*)

In early 2012 Plaintiff reported increasing numbness and pain in the neck, shoulder, and arm area which Dr. El-Mohandes found consistent wtih C5-6 radiculopathy to the right hand.  (R. 159.) He also found decreased range of motion at the shoulder which he thought could be cervical radiculopathy, distal peripheral neuropathy at the carpal tunnel, a shoulder problem, or elements of all three.  (*Id.*)  He planned to do further testing and noted that although studies had indicated carpal tunnel compression Plaintiff preferred not to have surgery.  (*Id.*)  Dr. El-Mohandes gave Plaintiff an epidural steroid injection and told her he would consider a repeat procedure in one to two weeks.  (R. 159.)

Plaintiff visited her Dr. Martzluf's office on February 16, 2012, and was seen by CRNP J. Palachick.  (R. 232.)  Office records indicate that, other than medication refills, the primary medical focus of the visit was Plaintiff's diabetes, including the observation that she had not been very compliant with appropriate followup.  (*Id.*)  CRNP Palachick noted that they talked for at least thirty minutes about Plaintiff's home situation and the difficulties Plaintiff was experiencing caring for her disabled mother.  (*Id.*)  CRNP Palachick noted that this was "obviously weighing on her heavily," adding that

> she can barely leave the house to do
> anything, and lately has just been shutting
> herself in the room so she can ignore her
> mother.  She is also just laying in bed

9

> sleeping most of the time which could be
> symptoms of her depression.  She states
> Wellbutrin is helping her somewhat, but
> obviously is not helping with her current
> situation.  We talked about possible Hospice,
> nursing home care, Respite care, and her
> mother is very adamant against some of these
> things.  She gets no help from her family,
> and mainly has to do everything herself.  She
> even had to quit her job in order to take
> care of her mother who seems to be very
> difficult to deal with . . . her disability
> an[d] amputation due to diabetes.  Patient
> was obviously very tearful and frustrated
> with everything.  She is not currently in any
> type of counseling, so I highly encouraged
> her to do this because she sort of shut
> herself off from everyone, and is not dealing
> with the problem at hand.

(R. 232.)  Plaintiff was assessed to have situational adjustment disorder and was directed to continue Wellbutrin, seek counseling, and try to get help with her mother's situation.  (*Id.*)

In March 2012, Plaintiff presented to Dr. El-Mohandes with continuing bilateral neck, shoulder, and right arm pain and new onset low back pain.  (R. 154.)  He found examination consistent with mechanical low back pain and sacroiliac joint dysfunction. (R. 154.)  Dr. El-Mohandes reviewed various therapies with Plaintiff and they decided to continue her medication management without change.  (*Id.*)  Plaintiff was to schedule chiropractic and physical therapy.  (*Id.*)

Plaintiff saw CRNP Moats on April 17, 2012, because she had been in a collision three days earlier and was experiencing muscle stiffness, neck and back pain.  (R. 240.)  CRNP Moats noted that

10

Plaintiff was taking Opana, denied use of Dilaudid, and was taking no other pain medications. (*Id.*)

Plaintiff's April 2012 visit with Dr. El-Mohandes was similar to her previous visit. (R. 150.) She noted that she was seeing a massage/chiropractic therapist. (*Id.*) In June, Plaintiff reported that she had been doing well on Opana for pain but she was no longer able to obtain it so Dr. El-Mohandes changed her to Oxycontin and Percocet though Plaintiff said that Percocet did little for pain. (*Id.*) Plaintiff's pain complaints continued in July and August 2012, noting increased global pain following the motor vehicle accident. (R. 151, 158.) Dr. El-Mohandes changed Plaintiff back to Opana because she had done well on it in the past. (R. 158.) In August Plaintiff reported moderate pain reduction but felt there was "room for improvement." (R. 151.) Dr. El-Mohandes again adjusted Plaintiff's medication regimen. (*Id.*)

Plaintiff again saw CRNP Moats in May 2012 with complaints of depression. (R. 242.) Problems related to her mother living with her and her mother's reliance on Plaintiff for care were again discussed. (*Id.*) Plaintiff reported sleeping sixteen to eighteen hours per day, crying almost all day and a total lack of motivation--all of which were putting a strain on her marriage. (*Id.*)

On August 9, 2012, Plaintiff had a psychiatric evaluation at

Franklin Family Services, Inc., performed by clinician Brett

Gilliam, LCSW.  (R. 259.)  The following "presenting problem" was

identified:

> She reports that she has chronic pain of a
> moderate to severe nature, she relates that
> she doesn't feel like she has control over
> her life.  She experiences chronic fatigue,
> low motivation and lack of interest.  She
> relates that she has been dealing with
> fibromyalgia for the last 13 years.  She has
> multiple medical issues, including diabetes
> and her fibromyalgia has increased in
> severity over the years.  She reports that
> her chronic pain is a major source of
> discomfort and her allergy to aspirin limits
> her ability to control pain.  She reports
> getting no relief from her pain and estimates
> a daily level of around 6 to 7.

(R. 259.)  Regarding mood, Plaintiff related a good mood, some

decrease in libido, minimal socializing, some irritability with

family, low motivation, low energy, and fair to poor

focus/concentration.  (*Id.*)  Plaintiff related that her mother was

her most considerable worry.  (*Id.*)

In September 2012 Plaintiff saw CRNP Palachick for followup of

her chronic problem list.  (R. 246.)  The following conditions were

identified in Plaintiff's problem list: obesity, irritable bowel

syndrome, diabetes mellitus, Type II, myalgia and myositis

unspecified, hyperlipidemia, migraine unspecified without mention

intractable migraine, benign hypertension, adjustment reaction

unspecified, depressive disorder major single episode unspecified.

(*Id.*)  Plaintiff reported she was "actually doing very well" which

12

included doing better with her living situation.   (*Id.*)

At her September 2012 visit with Dr. El-Mohandes, Plaintiff added neck spasms at night to her reported problems and Dr. El-Mohandes added Soma to address it.  (R. 157.)  In October she reported that the Soma had been helpful.  (R. 152.)

In November 2012, Plaintiff presented at Dr. Martzluf's office for evaluation of low back pain which she associated with an injury she sustained three weeks earlier when she was changing her mother. (R. 248.)  Other than vague tenderness to palpation in the muscles of the lower back, physical examination was unremarkable.  (*Id.*)

In December 2012, Dr. El-Mohandes increased the Opana dosage to address pain complaints.  (R. 155.)  Plaintiff continued to report that Soma had been helpful for the neck spasms.  (*Id.*)

In January 2013, Plaintiff and her husband met with Mr. Gilliam for an "unexpected session."  (R. 262.)  Mr. Gilliam recorded that Plaintiff appeared tearful and distraught, and she was feeling overwhelmed and consumed with medical complaints. (*Id.*)  Plaintiff related that she might want to start therapy but felt she was being forced into it by family.  (*Id.*)  Mr. Gilliam talked with her about the importance of consent and planned to see her for therapy if she wanted.  (*Id.*)  On a scale of one to seven, seven being "significant concern/issue," he rated Plaintiff's mood and anxiety at seven, and her attention at one ("no concern/issue").  (*Id.*)

13

In February 2014, Plaintiff again saw Dr. El-Mohandes with reports of bilateral neck and shoulder pain, right more than left arm pain, and right hip pain. (R. 307.) Plaintiff felt that some of her symptoms had gotten worse, especially her right hip. (*Id.*) Her examination revealed sensory, motor to be intact upper and lower extremities, negative spurling, negative Patrick, and tenderness to the right hip. (*Id.*) He prescribed a Medrol dosepak and continuation of Opana. (*Id.*) Dr. El-Mohandes again recorded that he told Plaintiff she would likely have intermittent continuous pain complaints and he noted that he would continue opioid management for pain control since Plaintiff reported reasonable response and no adverse reactions or problems. (*Id.*) He also noted that the drug screening obtained in October 2013 was consistent with therapy. (*Id.*)

At her next appointment in March 2014, Dr. El-Mohandes discussed scheduling steroid injections to treat her right sided low back and leg pain. (R. 303.) Dr. El-Mohandes also noted that he had performed a Multidimensional Pain Inventory and Plaintiff reported normal level of impairment, high level of social support, and normal level of activity. (R. 303.) After the March 21, 2014, steroid injections, and April 25, 2014, lumbar medial branch block, Plaintiff reported some reduction in her low back and right leg pain and increased left leg pain. (R. 306.) She chose not to repeat the steroid injections due to the high deductible. (*Id.*)

She was reporting increased pain all over and was "quite tearful" at her June 2014 visit. (*Id.*) At the time she reported moderate pain reduction with the opioids. (*Id.*) Notes from Plaintiff's July visit were similar. (R. 302.)

Plaintiff requested another medial branch nerve ablation on July 25, 2014, reporting that she had reasonable and sustained relief after the procedure on her right side in April 2014. (R. 301.) In addition to the procedure, Dr. El-Mohandes noted continuation of medical management. (*Id.*)

## 2. **Opinion Evidence**

*a.   State Agency Consultant*

In the Disability Determination Explanation dated April 15, 2013, Roger Fretz, Ph.D., the State agency consultant, concluded that Plaintiff had the severe impairment of Spine Disorders and the non-severe impairment of Affective Disorders. (R. 56.) He completed a Psychiatric Review Technique (PRT) and concluded the record contained no evidence of severe dysfunction in any area. (*Id.*) He opined that she was able to perform activities of daily living with some possible compromise secondary to medical issues, she was able to engage socially, and she had no memory deficits. (*Id.*)

*b.   Primary Care Provider*

Dr. Martzluf completed a Multiple Impairment Questionnaire indicating diagnoses of recurrent major depression, fibromyalgia,

and lumbar disc disease.  (R. 293.)  He noted trapezius and upper arm trigger points and fatigue as clinical findings that supported his fibromyalgia diagnosis; depressed mood, tearful, anhedonia, and insomnia as clinical findings supporting the depression diagnosis; and a 2010 MRI study to support the lumbar disc disease.  (*Id.*)  The primary symptoms of Plaintiff's depression were identified as depressed mood, tearfulness, fatigue, and insomnia.  (R. 294.)  The primary symptoms of Plaintiff's fibromyalgia were recorded as pain in trapezius, upper back, and upper arms, and the primary symptoms of her lumbar disc disease were sciatic notch to below the right knee and thigh pain.  (*Id.*)  Dr. Martzluf found Plaintiff's symptoms and functional limitations reasonably consistent with her impairments.  (*Id.*)  He identified the nature of the fibromyalgia pain as consistent ache with sharp pain periods that could last from minutes to hours; the frequency of the pain was constant; precipitating factors were busy schedule and frequent motion.  (R. 294-95.)  The nature of the lumbar disc disease pain was burning, throbbing pain in the locations previously identified which was made worse with activities; the frequency was daily, worse if a work day; precipitating factors were lifting, improper bending and stooping.  (*Id.*)  Dr. Martzluf identified Plaintiff's level of pain to be 7-8 and her fatigue to be 5 on a scale of 0-10.  (R. 295.)  He noted that the pain could not be completely relieved with medications.  (*Id.*)

16

Dr. Martzluf opined that Plaintiff could sit for eight hours in an eight-hour day, and she could stand/walk for one hour. (*Id.*) He noted that it would be necessary or medically recommended that Plaintiff not sit continuously in a work setting and she should get up and move around every sixty minutes for fifteen minutes. (R. 295-96.) He further opined that Plaintiff could frequently lift or carry up to ten pounds, occasionally lift or carry up to twenty pounds, and never lift over that weight. (R. 296.) Dr. Martzluf also noted that Plaintiff had significant limitations doing repetitive reaching or lifting. (*Id.*) He opined that Plaintiff's symptoms would likely increase if she were placed in a competitive work environment and she could not do a competitive job on a sustained basis that required her to keep her neck in a constant position. (R. 297-98.) He concluded that Plaintiff's experience of pain, fatigue, and other symptoms would constantly interfere with her attention and concentration, and he expected her impairments to last at least twelve months. (R. 298.) Contributing emotional factors were noted to be financial concerns and caregiver responsibilities for her aging mother. (*Id.*)

Dr. Martzluf noted that Plaintiff was not a malingerer. (*Id.*) He also concluded that Plaintiff was capable of handling moderate stress in that she had remained calm and unbiased in the face of her mother's illness despite her own suffering. (*Id.*)

Regarding the need for unscheduled breaks during the workday,

17

Dr. Martzluf opined that Plaintiff would need to take a twenty minute break every one to two hours. (*Id.*)  He found that her impairments would produce good days and bad days and she would likely be absent from work as a result of her impairments more than three days a month.  (R. 299.)

c. *Examining Consultant*

Mohammad Haq, M.D., conducted a disability evaluation on March 12, 2013.  (R. 274-85.)  He recorded that Plaintiff complained of progressively worsening pain over the preceding six years and an inability to function well due to pain during the past year.  (R. 274.)  She identified the location of the pain to be in the bilateral lumbosacral area, bilateral knees, between her shoulder blades, and the left trapezius area.  (R. 274-75.)  She reported that pain in her elbows had recently been better as a result of shots.  (R. 275.)  Plaintiff said the narcotic medications she took for pain produced side effects in the form of dizziness and drowsiness and she cannot function without taking the medication. (*Id.*)  Plaintiff reported difficulty doing grocery shopping, taking the garbage out, and doing routine activities of daily living. (*Id.*)

Plaintiff identified a history of depression of a few years duration.  (*Id.*)  She reported that she was under the care of a psychologist and she was taking antidepressant medication which had not helped much.  (*Id.*)

Examination of the muculoskeletal system showed the following:

> The patient has slight decrease in range of motion at the lumbar spine. Lumbar lordosis is slightly decreased. There is tenderness of the paraspinal muscle in the thorax, lumbar as well as in sacroiliac area. There is tenderness on bilateral sacroiliac joints. There is no muscle spasm notes. Also tenderness of the right trapezius is noted. There is mild tenderness of the elbows and of the left knee medially noted. The patient also has mild-to-moderate tenderness of the costochondral junction anteriorly as well. There is no muscle atrophy noted. Slight decrease in the range of motion of the neck is also noted. Examination of the joints of the hands is within normal range.

(R. 278.) Neurological examination showed normal gait and station, and Dr. Haq noted that Plaintiff was able to get on the examining table with no problem. (*Id.*) His assessment included fibromyalgia, depression, and a history suggestive of degenerative arthritis. (*Id.*)

Dr. Haq concluded that Plaintiff could frequently lift up to ten pounds and occasionally lift twenty pounds; she could frequently carry two to three pounds and occasionally ten pounds; she could stand/walk for one to two hours cumulatively in an eight-hour day and sit for one hour; she could occasionally bend, kneel, balance and climb and never stoop or crouch; she could not perform other identified physical functions such as reaching, handling and fingering; and she had to avoid temperature extremes. (R. 280-81.)

19

**3.**    **Hearing Testimony and Function Report**

Plaintiff testified that she cooked very little and her husband did most of the grocery shopping and most household chores. (R. 37-38.)  She said she did not drive any more than she had to, had trouble walking the two blocks to the hearing, and she had problems standing and sitting for extended periods.  (R. 39.)  She stated "I just hurt all over, 24 hours a day."  (*Id.*)

Plaintiff described a typical day to include frequent rests for up to an hour and a half—"however long it takes for my body to feel a little bit better."  (R. 40.)  Plaintiff said she takes her medications as prescribed and they helped at times but more with the arthritis than fibromyalgia.  (R. 41.)  She identified medication side effects to include sleepiness and dry mouth which in turn caused issues with her teeth.  (*Id.*)  She said the fibromylagia was mostly in her arms and down her torso and she feels like she has "double the aches of the flu, of a very severe flu" which is always there.  (R. 42.)  Plaintiff testified that her back goes out very easily and she has had injections to help with pain.  (R. 42-43.)  She said the injections help for a little while but some not long at all, stating that "[m]y neck and shoulders are probably the worst for that as far as the injections, and—because I have so much issues with my lower back, I need more than the injections."  (R. 43.)  Plaintiff also testified that she has some pain in her back all the time and severe pain several days a week.

(*Id.*)

In the Function Report completed on January 17, 2010, Plaintiff indicated that her conditions limited her ability to work because she was not able to lift, stand or sit for long periods without discomfort.  (R. 124.)  She added that a bad allergy to aspirin required her to take strong pain medication which made her drowsy, and, due to nerve pain in her arms it was hard for her to lift, and it was hard for her to sit, stand, play with babies on the floor and do other activities with adults and infants due to pain in her hips, legs, and back.  (*Id.*)

When asked to identify the places she went on a regular basis, Plaintiff responded that she went to the grocery store and to visit her mother in the nursing home--both with her husband.  (R. 128.) Plaintiff indicated that her ability to do almost all of the listed activities was limited by her conditions, providing examples of how the activities were impacted.  (R. 129.)

## 4.   **ALJ Decision**

ALJ Riley issued his decision on August 28, 2014, considering evidence submitted up to that date.  (R. 19-32.)  He made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since September 22, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe
    impairments: degenerative disc disease
    of the lumbar spine and the cervical
    spine, fibromyalgia, headaches and mood
    disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment
    or combination of impairments that meets
    or medically equals the severity of one
    of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1 (20 CFR
    404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the
    entire record, the undersigned finds
    that the claimant has the residual
    functional capacity to perform light
    work as defined in 20 CFR 404.1567(b)
    except with a sit/stand option at will.
    The claimant is capable of occasional
    climbing of stairs, balancing, stooping,
    kneeling, crouching, crawling and
    overhead reaching, but never any
    climbing of ladders.  The claimant
    retains the mental capacity to perform
    simple, routine, repetitive tasks.

6.  The claimant is unable to perform any
    past relevant work (20 CFR 404.1565).

7.  The claimant was born on July 30, 1961
    and was 50 years old, which is defined
    as an individual closely approaching
    advanced age, on the alleged disability
    onset date (20 CFR 404.1563).

8.  The claimant has at least a high school
    education and is able to communicate in
    English (20 CFR 404.1564).

9.  Transferability of job skills is not
    material to the determination of
    disability because using the Medical-
    Vocational Rules as a framework supports
    a finding that the claimant is "not
    disabled," whether or not the claimant
    has transferable job skills (See SSR 82-
    41 and 20 CFR Part 404, Subpart P,

Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability as defined in the Social Security Act from September 22, 2011 through the date of this decision (20 CFR 404.1520(g)).

(R. 21-31.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that

Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 30-31.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social

> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v.*

26

*Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

27

### IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed and the matter should be remanded for the following reasons: 1) the ALJ failed to properly evaluate the medical evidence; and 2) the ALJ failed to properly evaluate Plaintiff's subjective complaints.  (Doc. 7 at 14.)

### A.    *Evaluation of Medical Evidence*

Plaintiff asserts the ALJ failed to properly evaluate the medical evidence, specifically arguing the ALJ's finding that Plaintiff could perform a range of light work is without any support in the record.  (Doc. 7 at 15.)  Defendant argues the ALJ followed the controlling regulations in evaluating the opinion evidence.  (Doc. 8 at 4.)  I conclude this claimed error is cause for remand.

Plaintiff first points to the ALJ's consideration of Dr. Martzluf's opinion.  As the treating physician, the opinion would be entitled to controlling weight in certain circumstances.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely

28

accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d

Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).

The regulation addresses the weight to be given a treating source's

opinion: "If we find that a treating source's opinion on the

issue(s) of the nature and severity of your impairment(s) is well-

supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other

substantial evidence in your case, we will give it controlling

weight."  20 C.F.R. § 404.1527(c)(2).[2]  "A cardinal principle

_____

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by

---

> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."  20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.*

*Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.*

*Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of*

*Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318

(3d Cir. 2000) (holding that an ALJ's credibility judgments alone

cannot override a treating physician's medical opinion that is

supported by the evidence)).  *Drejka* also noted that where the

treating physician made the determination the plaintiff was

disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

The ALJ gave the Dr. Martzluf's opinion only partial weight because he found

> to the extent that the opinion is suggestive
> that the claimant is incapable of performing
> competitive work activities, it is
> inconsistent with the medical evidence
> indicating that the claimant realized
> improvement in symptoms with medication
> management, injections and nerve blocks, the
> claimant's ability to walk a normal gait and
> the claimant's ability to act as the sole
> caretaker for her disabled mother after the
> allege[d] disability onset date.  Further,
> while Dr. Martzluf repeatedly references
> fibromyalgia and related symptoms in his
> medical source statement, his submitted
> treatment notes hardly reference fibromyalgia
> or its treatment.

(R. 29-30.)

The problem with the ALJ's assessment of Dr. Martzluf's opinion is that he does not acknowledge evidence supportive of the opinion and misconstrues the record to some degree.  Importantly, records show that Plaintiff's fibromyalgia and related pain issues were addressed by Dr. El-Mohandes and Dr. Martzluf was routinely sent a copy of Dr. El-Mohandes office notes.  (R. 150-95, 222, 234, 301-07.)  Thus, the record shows that Dr. Martzluf had an ongoing knowledge of Plaintiff's fibromyalgia symptoms and related

32

treatment and the ALJ's discounting of his opinion based on the contents of his office notes cannot be deemed to be based on substantial evidence.

Turning to Plaintiff's symptoms, although she "realized improvement in symptoms" with treatment as recognized by the ALJ, he did not note that Dr. El-Mohandes often discussed the difficult management of the fibromyalgia-related pain experienced by Plaintiff, the reality that she would likely have intermittent continuous pain, would likely always be in some degree of pain, and that the pain reduction and symptom improvement was often rated as moderate.  (*See*, *e.g.*, R. 164, 167, 302, 306.)  Further, "improvement" in symptoms does not mean that the residual symptoms and pain are not disabling.  Regarding Defendant's assertion that the ALJ explicitly considered these treatment notes (Doc. 8 at 6 (citing R. 25-26)), I find that the ALJ's reference to relevant office notes does not include Dr. El-Mohandes discussion of the reality that Plaintiff will likely always be in some degree of pain.  (*See*, *e.g.*, R. 167, 302, 306.)

In finding Plaintiff's care of her disabled mother inconsistent with Dr. Martzluf's assessment that Plaintiff was not capable of performing competitive work activities, the ALJ does not acknowledge the difficulties Plaintiff experienced in conjunction with the care of her mother (*see*, *e.g.*, R. 232), nor did the ALJ explore through testimony or otherwise what the care entailed or

33

how Plaintiff accomplished it.  The ALJ does not seem to consider the possibility that a person with serious impairments would step into the breach when needed to care for someone with more debilitating problems.  Such a person should not be deemed able to perform competitive work on a sustained basis as a matter of course.  Therefore, I cannot conclude that the ALJ's determination that this care is not consistent with a disabling level of impairment is based on substantial evidence.

Because this analysis shows that the bases identified by ALJ Riley for discounting Dr. Martzluf's opinion do not constitute substantial evidence, this matter must be remanded for further consideration.[3]

## B.   *Credibility*

Plaintiff asserts that the ALJ failed to properly evaluate her subjective complaints of pain and fatigue.  (Doc. 7 at 20.) Defendant maintains the ALJ appropriately considered Plaintiff's subjective complaints.  (Doc. 8 at 13.)  I conclude that Plaintiff's subjective complaints should be reevaluated upon remand.

---

[3]  Because this matter must be remanded for the reasons discussed in the text, the issue of the alleged contradiction between Dr. Martzluf's opinion and the ALJ's reliance upon it to the extent it suggests Plaintiff is capable of light work which was raised in a footnote in Plaintiff's brief (Doc. 7 at 16 n.6), discussed in a footnote in Defendant's brief (Doc. 8 at 5 n.1), and expanded upon in Plaintiff's reply brief (Doc. 9 at 2) should also be addressed upon remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

An ALJ is not required to specifically mention relevant Social Security Rulings.  *See Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003).  It is enough that his analysis by and large comports with relevant provisions.  *Id.*

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the

35

> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an

individual's statements is their consistency, both internally and

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under

which a claimant's subjective complaints are to be considered.  20

C.F.R. § 404.1529.  First, symptoms such as pain, shortness of

breath, and fatigue will only be considered to affect a claimant's

ability to perform work activities if such symptoms result from an

underlying physical or mental impairment that has been demonstrated

to exist by medical signs or laboratory findings.  20 C.F.R. §

404.1529(b).  Once a medically determinable impairment which

results in such symptoms is found to exist, the Commissioner must

evaluate the intensity and persistence of such symptoms to

determine their impact on the claimant's ability to work.  *Id.*  In

so doing, the medical evidence of record is considered along with

the claimant's statements.  *Id.*

Relevant regulations provide that factors which will be

considered relevant to symptoms such as pain are the following:

activities of daily living; the location, duration, frequency and

intensity of the pain or other symptoms; precipitating and

aggravating factors; the type, dosage, effectiveness and side

effects of medications taken to alleviate symptoms; treatment

received other than medication intended to relieve pain or other
symptoms; other measures used for pain/symptom relief; and other
factors concerning functional limitations and restrictions due to
pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii),
416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration
> to a claimant's subjective complaints of
> pain, even where those complaints are not
> supported by objective evidence. *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).
> "While there must be objective evidence of
> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself." *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence. *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

In discounting Plaintiff's credibility, the ALJ pointed to the
following: she did not undergo treatment with a rheumatologist,
orthopedist or neurologist; there is no indication she sought
treatment for her impairments in 2013 aside from attending the
consultative examination; her symptoms improved through treatment;
she was a caregiver for her disabled mother during the relevant
time period; she went to Ocean City and tanning regularly; she
reported to a provider that she quit her job to take care of her

mother; other activities of daily living suggest symptoms not as limiting as alleged, e.g., she has her driver's license, she performs household chores and other activities including preparing meals, washing dishes, laundering clothes, dusting, caring for the dog, going grocery shopping and tanning, and visiting her mother at a nursing home and her daughter in Ocean City.  (R. 28.)

When considered in the context of the entire case record as required by SSR 96-7p, I conclude that the specific reasons for the weight given to Plaintiff's statements are lacking.  First, merely citing evidence does not show that Plaintiff's subjective complaints of pain and fatigue are not credible.  This is a case where medical evidence, particularly Dr. El-Mohandes numerous office notes, support Plaintiff's complaints of pain.[4]  Thus, "the complaints should be given 'great weight' and may not be disregarded unless there exists contradictory medical evidence." *Mason*, 994 F.2d at 1068 (citation omitted).  Neither the ALJ nor Defendant point to such evidence.  The fact that Plaintiff did not undergo treatment with a rheumatologist, orthopedist or neurologist (R. 28) does not contradict the pain documented by Dr. El-Mohandes notes.  While the lack of treating notes during 2013 (R. 28) is

---

[4]  In addition to the evidence discussed in the previous section of the Memorandum, office notes also show that Plaintiff was regularly treated with opioid medications, including Opana ER during the relevant time period.  (*See*, *e.g.*, R. 157, 165, 307.) Opana ER is for around-the-clock treatment of severe pain. http://www.drugs.cm/opana.html.  Dizziness, drowsiness, tired feeling and sleep problems are common side effects.  (*Id.*)

curious, there is some indication that Plaintiff continued treating with Dr. El-Mohandes during this period in that his February 2014 office notes state that Plaintiff had testing done in October 2013, a "UDS obtained 10-18-13 was consistent with therapy." (R. 307.) At the same visit he referenced a *continuation* of opioid management with no indication of a gap in treatment. (*Id.*)  As noted previously, the fact that Plaintiff's symptoms improved through treatment (R. 28) does not mean that she did not continue to experience pain and symptoms that would preclude gainful employment, particularly that the record also shows she reported worsening symptoms at times and that Dr. El-Mohandes counseled her that ongoing pain was likely. (*See*, *e.g.*, R. 302.)  As discussed in the previous section of this Memorandum, the fact that Plaintiff was a caregiver for her disabled mother during the relevant time period does not undermine her complaints of pain and fatigue, particularly when the record shows the emotional toll the caregiving took on Plaintiff. (*See*, *e.g.*, R. 232.)  While the record shows that CRNP Palachick stated on February 16, 2012, that Plaintiff "even had to quit her job in order to take care of her mother," (R. 232), Plaintiff herself did not say this nor was she asked about it at the hearing before ALJ Riley.  Because office notes concurrent with the alleged onset date indicate that Plaintiff was experiencing "increasing global pain throughout her major joints and the shoulder/pelvic girdle" at the time (R. 165),

without more than CRNP Palachick's single notation, a conclusion that Plaintiff stopped working for reasons other than her impairments is not warranted.  Finally, the ALJ's references to Plaintiff's activities of daily living do not include the limitations on those activities which Plaintiff identified in her testimony: though she drives, it is as little as possible (R. 38); she cooks but very little and her husband usually finishes preparing meals (R. 37); she does dishes but only to the extent that she loads the top shelf of the dishwasher (*id.*); and she does not do laundry (R. 38).  Plaintiff's Function Report shows that her care for her dog was minimal (letting her out, giving her treats and food) (R. 125), and she went with her husband when visiting her mother at a nursing home and her daughter in Ocean City (R. 28). The ALJ's overstatement of Plaintiff's activities of daily living, without an explanation for the elimination of the qualifying aspects of Plaintiff's testimony and statements, renders his reliance on her activities of daily living problematic.

Though Defendant seeks to support the ALJ's credibility analysis by pointing to the relevance of an individual's consistency in determining credibility, she does not show a lack of consistency in the record.  (*See* Doc. 8 at 14-15 (citing SSR 96-7p).)  Defendant points to the following as evidence of inconsistency:

> Plaintiff reported improvement with conservative measures and required no

> surgery; there was no indication that she
> sought any treatment in 2013; despite having
> various physical impairments, clinical
> findings showed that Plaintiff had no atrophy
> or any difficulty walking; and during the
> time that she was disabled, she engaged in
> various daily activities, including being the
> sole caretaker of her mother.

(Doc. 8 at 14.)

I agree that SSR 96-7p provides that "[o]ne strong indication
of the credibility of an individual's statements is their
consistency, both internally and with other information in the case
record." SSR 96-7p, 1996 WL 374186, at *5. However, neither the
ALJ decision nor Defendant's brief show how the cited evidence
contradicts Plaintiff's complaints of pain and fatigue: merely
citing evidence is not providing the explanation contemplated by
SSR 96-7p. Further, my review of the record does shows that
Plaintiff similarly presented her physical and emotional problems
to all providers throughout the relevant time period. *See supra*
pp. 4-15.

Thus, in the context of the record as a whole, I conclude the
ALJ's credibility determination is not supported by substantial
evidence and should be reevaluated upon remand.

### V.  Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal
is properly granted. This matter is remanded to the Acting
Commissioner for further consideration consistent with this

41

opinion.   An appropriate Order is filed simultaneously with this Memorandum.


                                        S/Richard P. Conaboy
                                        RICHARD P. CONABOY
                                        United States District Judge


DATED: March 21, 2016